**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**LAVELL JONES,**

**Plaintiff,**

-against-

**THE CITY OF ALBANY, RONALD MATOS, P.J. McKENNA, ANTHONY RYAN, MICHAEL SBUTTONI, and PHILLIPPA P. GARLAND-WILCOX, ADMINISTRATOR FOR THE ESTATE OF KENNETH P. WILCOX**

**Defendants.**

---

**COMPLAINT**

**Dkt. No. 17 cv 4082 (___)**

---

**PLEASE TAKE NOTICE** that Plaintiff Lavell Jones, through his attorneys at Glenn A. Garber, P.C., hereby alleges as follows:

**NATURE OF THE CASE**

1.     Plaintiff Lavell Jones ("Jones") was wrongfully convicted of the 1996 homicide of Erik Mitchell and served nearly two decades in jail.

2.     Jones was only 21 years old when he was unjustly indicted, prosecuted, tried, convicted, and imprisoned.  Despite his release and vindication, he is struggling to pick up the pieces of his broken life.

3.     This tragedy began for Jones in 1997 when he was detained and interrogated in Brooklyn, New York (where he lived) by Albany Police Department detectives and then transported in custody to Albany, New York where the interrogation continued.

4.     The detectives used coercive and deceitful techniques, and after 48 hours without sleep and 36 hours without food, he falsely confessed to participating in the murder of Erik

1

Mitchell.  In addition, detectives coerced other alleged co-defendants and a witness into making false statements, fabricated evidence, and exploited this false information to obtain Jones' false confession.

5.    The detectives also hid their misconduct from prosecutors, lied to them, and forwarded false evidence to them, which led to the wrongful indictment, prosecution, unfair trial, and wrongful conviction of Jones.

6.    Jones was then sentenced to 37 ½ years to life in jail.  He spent nearly 19 years behind bars until the real killer, Jeffrey Conrad, truthfully confessed to killing Erik Mitchell and that he acted alone.  Conrad spontaneously confessed on video-tape when he was being questioned about an unrelated crime and provided details about the Erik Mitchell murder that only the true killer would know and which were not fed to him by the police.  Jones was later exonerated of the Erik Mitchell murder based upon the consent of the prosecution and released from prison.

7.     The causes of this terrible injustice are the horrific misconduct (and coverup) of detectives of the Albany Police Department, their superiors, and the City of Albany.  The claims related to this injustice involve the deprivation of Jones' United States Constitutional rights against self-incrimination, due process of law, and a fair trial.  They also include malicious prosecution under federal and state law, conduct that shocks the conscience under federal law, and the infliction of emotional distress under state law.

## JURISDICTION AND VENUE

8.    This Court has original subject matter jurisdiction over Jones' federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because Jones' claims arise under a law of

the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation under color of state law of rights guaranteed by the United States Constitution.

9.    This Court has supplemental jurisdiction over Jones' state law claims pursuant to 28 U.S.C. § 1367(a).

10.    Jones complied with the requirements of New York General Municipal Law Section 50-i by serving a notice of claim on the City of Albany a notice on August 8, 2016. More than 30 days have elapsed since the notice of claim, and no offer of settlement has been made.

11.    Jones submitted to a hearing pursuant to New York General Municipal Law Section 50-h on October 18, 2016.

12.    Venue is lodged in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because substantial parts of the events or omissions giving rise to the claim occurred in the Eastern District of New York, including (i) part of Jones' interrogation, during which he was detained, denied food and, not permitted to sleep, and (ii) all of Sakina Mitchell's interrogation, which resulted in a coerced, false statement that was key in ultimately breaking Jones' will, causing his false confession and ensuing wrongful prosecution and incarceration.

13.    At all relevant times mentioned herein and currently (but for his incarceration) Jones was and is a resident of the State of New York, living within the jurisdiction of the United States District Court for the Eastern District of New York.

## JURY DEMAND

14.    Jones demands trial by jury in this action.

## PARTIES

15.    Jones was wrongfully indicted, prosecuted, tried, convicted, and imprisoned by the actions of the Defendants named herein.

16.    Defendant City of Albany is a municipal corporation existing by virtue of the laws of the State of New York and a political subdivision of the State of New York.

17.    The Albany Police Department is an agency of the City of Albany.

18.    Defendant Detective Ronald Matos ("Matos") was at all relevant times a detective employed by the Albany Police Department. He is named here in his individual capacity.

19.    Defendant Detective P.J. McKenna ("McKenna") was at all relevant times a detective employed by the Albany Police Department. He is named here in his individual capacity.

20.    Defendant Detective Anthony Ryan ("Ryan") was at all relevant times a detective employed by the Albany Police Department. He is named here in his individual capacity.

21.    Defendant Detective Michael Sbuttoni ("Sbuttoni") was at all relevant times a detective employed by the Albany Police Department. He is named here in his individual capacity.

22.     Defendant Detective Kenneth P. Wilcox ("Wilcox") was at all relevant times a detective employed by the Albany Police Department. He is named here in his individual capacity through his estate.

23.    Defendant Detectives Matos, McKenna, Ryan, Sbuttoni, and Wilcox are at times collectively referred to as the "Individual Detectives" herein.

24.    "Defendants" refers herein to the Individual Detectives, the City of Albany and by extension the Albany Police Department.

## FACTS AND ALLEGATIONS COMMON TO ALL CLAIMS

### Erik Mitchell is Murdered by Jeffrey Conrad

25.     Jeffery Conrad ("Conrad") went to Erik Mitchell's house at 195 Clinton Avenue in Albany on February 18, 1997 sometime between 9 p.m. and 11:40 p.m. with the intention of robbing him. Erik Mitchell was a drug dealer and believed to possess drugs and money.  Conrad rang the doorbell, Erik Mitchell opened it, Conrad put a .25 caliber handgun in his face, Erik Mitchell tried to grab it, and Conrad pulled the trigger. Conrad shot him at close range (six to twelve inches), on the left side of his head. Erik Mitchell fell in the alcove near the stairs down to his basement apartment and collapsed into a sitting-like position against the wall. After the murder, Conrad hacksawed the .25 caliber handgun and discarded the pieces.

26.     Conrad was not connected to Erik Mitchell's homicide for more than 17 years. On September 24, 2014, Jeffrey Conrad was arrested in Cleveland, Ohio for the brutal stabbing murder of his former girlfriend – he stabbed her more than 50 times. When questioned by Cleveland detectives in a recorded interview, he spontaneously revealed that he was the person who shot and killed Eric Mitchell with a .25 caliber gun in the doorway of his Clinton Avenue apartment, in Albany, on a February night in 1997. He mocked law enforcement for botching the case, and he accurately described the crime he committed, including the location, time-frame, where Erik Mitchell was shot, the gun that was used, and how the body fell.

27.     Conrad had no apparent reason to falsely confess to the Erik Mitchell murder. He does not know Jones or his codefendants and reiterated throughout the police interviews that he does not care what happens to them.

5

28.     The voluntary, unprompted, recorded, detailed confession of Conrad, absent of police contamination, leaves no doubt that Conrad alone killed Erik Mitchell, and that Jones was not involved in any way.

### Albany Police Investigate Erik Mitchell's Murder and Create a False Case Against Jones

29.     On February 18, 1997 at approximately 11:40 p.m. Albany detectives arrived at the crime scene.  Based on their observations and forensic analysis they soon learned that:

    a.   The decedent Erik Mitchel was a black male, 6'1" and 188 pounds;

    b.   He was shot in the vestibule near his front door, close to the stairs that led to his basement apartment;

    c.   He was shot at close range although the gun was not pressed to the skin;

    d.   He was shot once on the left side of his head;

    e.   He was shot with a .25 caliber bullet (although they never found the gun); and

    f.   His dead body was situated in a sitting-like position against the vestibule wall.

30.     Before the murder on October 4, 1996, Erik Mitchell's apartment was robbed by Matthew Parsons ("Parsons"), Zakee Abdul-Hameed ("Abdul-Hameed"), Pierre Lyons ("Lyons), Carl Dukes ("Dukes), and Jones. Erik Mitchell was not home, but two of his friends were, Gregson Joseph and Camon Wyatt. Jones left the apartment quickly after the break in once it was learned that there was nothing of real value. The others took a PlayStation, some clothing, a jacket, and other items. Parsons had a gun, and after Jones left, Parsons tied up Erik Mitchell's two friends and pistol whipped one of them.

31.     The Albany detectives investigating the burglary had already connected it to Parsons and Abdul-Hameed prior to Erik Mitchell's murder. Parsons was arrested with the stolen property roughly 12 hours after the burglary, and Abdul-Hameed was arrested about a week

later. In addition to Abdul-Hameed, Parsons named Lyons, Dukes, and Jones as participants in the burglary, but they had not yet been arrested because they were only identified as "Pierre," "Haniff," and "La," respectively, and the detectives did not know who they actually were.

32.     Detectives questioned Parsons about Erik Mitchell's murder, but he had a strong alibi and was eliminated as a suspect. Parsons did, however, tell the detectives that "Pierre" had been arrested on another charge, which allowed them to determine that "Pierre" was Pierre Lyons.

33.     On February 26, 1998, detectives tried to speak to Abdul-Hameed, but he was not home. They found Lyons, who was interviewed just after midnight and was arrested on February 27, 1997 – but only for his role in the October 1996 burglary, not the homicide. Lyons denied any involvement in the homicide.

34.     There was no evidence linking any of the burglary suspects to Erik Mitchell's homicide.  After several more weeks of investigation into Erik Mitchell's drug dealing activities, his gambling history, and his associates, detectives had few solid clues about what occurred on the night of the murder or who the perpetrators were. Desperate for results, Erik Mitchell's father posted a reward for information leading to the arrest and conviction of those responsible for his son's murder.

35.     Under increasing pressure to close the case, on April 19, 1997 Detectives Matos and Sbuttoni re-interrogated Parsons – although they did not document this interview until almost two weeks later. At the time, Parsons had pled guilty to the October 1996 burglary and was awaiting sentencing.  Parsons told the detectives, without specifying where he received the information, that "Haniff" also went to Erik Mitchell's apartment to intimidate him and then shot him, and that "Haniff" was Abdul-Hameed's cousin.

36.     This statement was false and matched the detectives pre-existing theory of the case, that the burglary and homicide were connected and were perpetrated by the same people (except Parsons, who had an alibi).  Later, Parsons was offered three years off his sentence on the burglary for his cooperation.

### Dukes' Arrest and Interrogation

37.     "Haniff" is Carl Dukes' middle name.  Dukes is Abdul-Hameed's cousin.

38.     On September 8, 1997, Dukes was picked up at a courthouse in Albany, where he was being held on an unrelated charge. Several detectives took him to an upstairs conference room and Detectives Matos and Wilcox started interrogating him around 9 a.m.

39.     After initially resisting, Dukes admitted to being part of the October 1996 burglary. Between 12:35 p.m. and 1:14 p.m., Detectives Matos and Wilcox drafted a statement that included details of the burglary, some accurate and some inaccurate. During the interrogation, Detective Wilcox promised to take Dukes to see his daughter, who was born prematurely and still in the hospital.  Anxious to go home and going along with the detectives, Dukes signed the statement without reading it.

40.     Detectives Matos and Wilcox, however, had no intention of taking Dukes to see his daughter. Now that Dukes had admitted to participating in the burglary, they became more aggressive and started questioning him about the Erik Mitchell homicide. Dukes did not realize it at the time, but in the statement he signed and did not read, was a section that said, "In February the guy who owns the apartment there got shot and I know about how that happened." When Detectives Matos and Wilcox pointed this out, Dukes was shocked, and tried to rip it up. He started crying, and telling the detectives, truthfully, that he knew nothing about the homicide.

41.    Increasing the pressure, Detective Wilcox started calling Dukes a "punk," and a "pussy," and kept feeding Dukes theories about what happened. Dukes continued to deny knowing anything about the homicide, and told the detectives that they were just trying to get their story, and not the truth. The detectives then started threatening Dukes with the death penalty, implying he was going to die if he did not confess to the Erik Mitchell murder.

42.    Feeling trapped and fearing death, at approximately 3 p.m. Dukes signed a statement, drafted and handwritten by Detective Matos. Manipulating Dukes and easing his way to confess, the detectives minimized his responsibility, saying it was Lyons's idea to confront Erik Mitchell and claiming that Jones pulled the trigger.

43.    The statement, which was created by Matos, included several facts about the Erik Mitchell homicide that Detectives Matos and Wilcox knew from the crime scene, or was part of the detectives' pre-existing theory of the case. Drawing from the detectives' knowledge and not Dukes, Matos wrote:

   a.   The approximate date of the Erik Mitchell homicide (in February of 1997);

   b.   The approximate time he was killed (it was dark);

   c.   That he was shot once with a .25 caliber handgun;

   d.   That the homicide took place near Erik Mitchell's front door; and

   e.   That Parsons was not involved in the homicide (the detectives knew he had an alibi).

44.    This statement – which was created by Detectives Matos and Wilcox – also included false facts that conformed to their pre-existing theory of the case, and that did not come from Dukes:

   a.   The homicide was directly connected to the burglary;

9

b.  There was an argument between the assailants and Erik Mitchell right before the gun went off; and

c.  Lyons and Jones participated in the homicide, along with Dukes.

45.    Dukes, however, knew nothing about the homicide, and his statement implicating himself, Lyons, and Jones was a total fabrication.

**Parsons Changes His Story**

46.    In September 1997, Parsons decided to tell the truth, he refused to cooperate with the prosecution, and he refused to continue lying about the Erik Mitchell homicide. Retaliating, the prosecution wrote to the judge presiding over Parsons' burglary case, saying that Parsons was no longer cooperative, urging no leniency, and arguing he should receive the maximum sentence.

47.    On October 10, 1997, Detective Wilcox visited Parsons in jail and obtained a false statement that conformed to the statement Wilcox had obtained from Dukes, and also included several facts about the Erik Mitchell homicide that Detective Wilcox knew from the crime scene or was part of the detectives' pre-existing theory of the case:

a.  That the homicide took place near Erik Mitchell's front door;

b.  That he was shot once, in the head;

c.  That Lyons, Dukes, and "La" (Jones) were involved in the homicide (which was false);

d.  There was an argument between the alleged assailants and Erik Mitchell, right before the gun went off (which was false); and

e.  That the homicide was directly connected to the burglary (which was false).

48.    Parsons' statement contradicts his prior statement, which said that only Dukes and Abdul-Hameed went to Erik Mitchell's house to intimidate him.  It did not mention Lyons or

Jones and did not contain other details that appeared for the first time in Parsons' statement on October 10, 1997.

49.     It is implausible that Parsons alone crafted a false statement that both conformed to the known evidence about the case and to the detectives' theory of the case without misconduct from Detective Wilcox and other detectives because 1) Conrad acted alone to kill Erik Mitchell and 2) the other coerced statements contain the same false facts that came from the interviewing detectives and not the witnesses themselves.

### Jones' Arrest and Interrogation in Brooklyn

50.     On October 29, 1997, Jones was living at 59 Chauncey Street in the Bedford-Stuyvesant section of Brooklyn. Around 9 p.m. or 10 p.m. that evening, Jones was in his car, parked on Underhill Avenue between St. Marks Street and Bergen Street. Jones' friend, Mikal Ameen ("Ameen") was sitting in the back seat.

51.     A police car pulled up next to Jones' car, and an officer asked Jones for his license and registration. Jones turned over his ID and the title to the car, and then the officer asked him to step outside of the vehicle. Jones complied. Another officer then asked Ameen to step out of the car. Ameen started to run, and the officer jumped on him. Ameen was carrying a shotgun, and after the officer found it, both Ameen and Jones were arrested.

52.     Jones was taken to the 77th Precinct at approximately 11 p.m.  Jones waited, awake in a cell, for a few hours; he was not given food. At 3 a.m. or 4 a.m., now early in the morning on October 30, 1997, a police officer told Jones that he was going to Central Booking. Jones arrived there between 4 a.m. or 5 a.m., was stripped searched, and then placed in a cage area at around 6 a.m. or 7 a.m. Jones did not sleep because he thought he was going to be released at any moment, and because the jail did not have any place for him to sleep.

53.     Between 8 a.m. and 9 a.m., Jones spoke to a Legal Aid attorney for about ten minutes. Jones was told that he would go before a judge early in the morning, so he just paced back and forth and waited.

54.     But Jones never went before a judge. Instead, two officers showed up at 1 p.m. or 2 p.m. and took Jones to the 88th Precinct.  Although Jones did not know it at the time, the district attorney declined to prosecute him for gun possession due to lack of evidence.  Instead, he was being held based on domestic violence charges that his then girlfriend, Sakina Mitchell, was trying to have dismissed.

55.     Meanwhile, Albany Detectives Anthony Ryan and P.J. McKenna went to the 77th Precinct at 4 p.m., after being notified by the New York Police Department, who knew that the Albany Police Department was looking for Jones. The detectives then learned that Jones had been transferred to Brooklyn Central Booking, and then to the 88th Precinct. The detectives arrived at the 88th Precinct around 5:30 or 6:00 p.m. Notably, the Albany detectives did not apply for a warrant to arrest Jones.

56.     Sometime after the detectives arrived at the 88th Precinct, Jones was taken into an interrogation room with Detectives Ryan and McKenna. He was handcuffed to the furniture in the room. Detective Ryan asked Jones if he knew anything about a burglary in Albany. Jones initially denied any knowledge of it. Detective Ryan then lied to Jones telling him he was in a lot of trouble on the gun charges, but that he could make them go away if Jones cooperated. Detective Ryan told Jones that Dukes, Lyons, Parsons, and Zakee had all implicated him in the burglary, and then he showed Jones one of Dukes' statements.

57.    Finally, Jones admitted to participating in the burglary at 195 Clinton Avenue in Albany, and provided an oral statement to Detective McKenna, who wrote it down (part by hand and part with a typewriter). Jones signed the statement around 7:50 p.m.

58.    After Jones signed the statement, Detectives Ryan and McKenna asked him if he was involved in the Mitchell homicide; Jones told them that he was not in Albany at the time. The detectives continued questioning Jones for hours, rebuffing his denials of not being involved with the homicide.

### In Brooklyn, Sakina Mitchell is Coerced and Manipulated into Falsely Implicating Jones on the Erik Mitchell Murder

59.    While Jones was being detained, Sakina Mitchell arrived at the 88th Precinct. She had gone to Central Booking and then the 88th Precinct, trying to drop the domestic violence charges she had filed against Jones earlier. She was told that she could not speak with Jones and was left in a room to wait for hours.

60.    Sometime that night, Sakina Mitchell went across the street to Detroit Chicken to buy food for herself and for Jones. But the police would not let her give the food to Jones. When she tried, someone screamed at her, ""No, he cannot get food. No, he cannot eat. No, you cannot see him."

61.    After the initial Jones interrogation, Detectives Ryan and McKenna took Sakina Mitchell into a small room; none of the officers from the 88th Precinct went with them. It was the first time she had ever been interrogated. She was young, extremely nervous, and had an 11th grade education. She was also pregnant with Jones' child.

62.    The detectives questioned Sakina Mitchell for hours. For parts of the interrogation, Detectives Ryan and McKenna would split up, with one interrogating Sakina Mitchell and the other interrogating Jones, who was in a different area of the precinct.

63.    The detectives asked Sakina Mitchell about the Erik Mitchell homicide over and over again, continuously rejecting her denials that Jones could not be involved.

64.    The detectives cursed at her, and started making threats, telling her that Jones was going to get the death penalty: "Well, you['re] going to have to help him, otherwise we're going to bring him to Albany and he'll never see his son grow up … and the baby will be a bastard." Detective Ryan told her: "You got to give me some kind of fucking answer about Lavell Jones or else your baby will be a bastard. He's going to get the gas chamber. This is not working. You have to give me something, or else he's going back to Albany and you will never see him again."

65.    Detectives Ryan and McKenna also started feeding Sakina Mitchell information; for example: "Well, we have reason to believe that Haniff [Dukes] could be the trigger man, but Lavell was around for the burglary." They showed her a statement from Dukes. One of the detectives even told her, falsely, that they had Jones' fingerprints on the gun.

66.    Finally, they typed up a statement and asked her to sign it. The statement falsely recounted information that Jones had purportedly told Sakina Mitchell in late February or early March. In it, the detectives tried to minimize Jones' involvement, saying that although he was present when Erik Mitchell was murdered, he did not pull the trigger. Despite being false, Sakina Mitchell signed the statement under duress believing that by minimizing Jones role in the homicide and saying he did not pull the trigger she would save him from the death penalty.

67.    The statement included several facts about the Erik Mitchell homicide that Detectives Ryan and McKenna knew from the crime scene or was part of the detectives' pre-existing theory of the case, but that Sakina Mitchell did not know, including:

a.    The approximate date of the Erik Mitchell homicide (in February of 1997);

b.    That the homicide took place in Albany;

14

c.  That both Dukes and Jones participated in the homicide, along with some unknown person or persons (which was not true);

d.  That Parsons was not involved in the homicide (the detectives knew he had an alibi);

e.  That Erik Mitchell was a victim or witness to a burglary committed by Dukes, Jones, and other men;

f.  That there was an argument between the alleged assailants and Erik Mitchell right before the gun went off; and

g.  That Erik Mitchell was killed near stairs.

68.  The statement Sakina Mitchell signed was a false creation made by Detectives Ryan and McKenna.

69.  At Jones' trial Sakina Mitchell truthfully explained that she was nervous and afraid and that she was manipulated by detectives into believing that she was helping Jones by acquiescing to the false statement.  However, the impact of her testimony was undermined by the misconduct of the Individual Detectives and the false evidence they created to implicate Jones in the Erik Mitchell murder.

**Jones' Interrogation Continues in Albany**

70.  Sometime late in the evening, possibly as late as 11 p.m., Detectives Ryan and McKenna handcuffed Jones, took him to their car, and drove him back to Albany. Jones asked to speak to Sakina Mitchell – his girlfriend, pregnant with his child – before they left, but the Detectives refused, saying that he could influence her testimony by talking to her.

71.     Jones remained shackled during the car ride.  He did not sleep at all and was arguing with Detective Ryan, who kept insisting that Jones knew about the Erik Mitchell homicide.

72.     Detectives Ryan and McKenna got back to headquarters at the Albany Police Department after 2 a.m. on October 31, 1997. They immediately took Jones to an interrogation room with a two-way mirror, shackled him to the floor, and continued the interrogation. Jones had not slept for nearly 48 hours when detectives entered and began to question him.

73.     Detective Matos started work around 1 a.m. on October 31, 1997, but he did not learn that Jones was in Albany until 4 a.m. when his supervisor, Detective Breen, with Detectives Ryan and McKenna, asked him to assist them in the interrogation. He was joined by Detective Sbuttoni. Detectives Ryan and McKenna brought Detective Matos up to speed as to what had happened with Jones' case and interrogation over the last two days. At least four detectives, including Detectives Matos, McKenna, Ryan and Sbuttoni, took turns questioning Jones about the Erik Mitchell homicide. They refused to accept Jones' repeated, truthful statements that he was not involved.

74.     Jones was not given a chance to sleep, and he was, effectively, not given any food. Jones told the detectives that he would not eat pork, and then the detectives gave him a sandwich with pork, to taunt him. Jones did not eat it. They slapped him and cursed at him, calling him a "fucking liar."

75.     Over the course of the ensuing interrogation, Jones maintained his innocence of the Mitchell murder. Detectives took turns questioning Jones.  During the handful of intermittent periods when detectives left him alone, Jones typed out at least three statements, all of which took on a tone of desperation as Jones communicated that he did not commit the murder. One

indicated that Jones wanted to commit suicide but was afraid that if he died, the truth of his innocence would never be known. In others, he expressed an unwillingness to implicate Dukes to save himself because he was not present for the murder and did want to lie. He also offered to take a polygraph test and lamented that he may never see his child grow up. Because these statements were exculpatory about the murder and did not include the story the detectives wanted, they were ripped out of the typewriter, some were destroyed, and others were never signed. Detectives also failed to take notes about these statements and their timing, thus the order in which they were made could not be reconstructed.

76.     No matter what Jones did, the detectives persistently rejected his protestations of innocence. Eventually though, Jones started to falter. To break his will, a detective confronted him with the specifics of Sakina Mitchell's false statement, asking him how it was possible that she could make a detailed statement regarding the homicide if Jones was innocent. Detectives also showed Jones a false statement Dukes had written implicating Jones as the shooter, and then detectives told Jones that he would receive the death penalty if he did not name Dukes as the shooter and describe himself as an accomplice. Jones finally succumbed to the detectives' demands, nearly 36 hours after he was arrested in New York, and after more than two days had passed since he had slept or eaten.

77.     At around 10:30 a.m. on October 31, 1997, a detective stood over Jones and dictated to him what he wanted him to write. To ease the false confession, the statement minimized Jones' role in Erik Mitchell's homicide, and claimed that Dukes actually shot Erik Mitchell. It included several facts about the Erik Mitchell homicide that Detectives Matos, McKenna, Ryan, and Sbuttoni knew from the police investigation, and it contained the detectives' pre-existing theory of the case but that Jones did not know independently:

a. That Dukes, Lyons, and Jones were involved in the homicide (which was not true);

b. That Parsons was not involved in the homicide (the detectives knew he had an alibi);

c. That there was an argument between the alleged assailants and Erik Mitchell, right before the gun went off (which was not true); and

d. That Erik Mitchell's murder was connected to the earlier burglary (which was not true).

78.    This final statement that implicated Jones on the Erik Mitchell murder was a fabrication, and soon after the interrogation he retracted it.

**Jones Retracts his Confession**

79.    Providing a window of insight into Jones' false confession shortly after it was made, Jones placed several phone calls to family members which he did not know were recorded.  He explained to his grandmother (at points, tearfully) that the detectives did not believe him when he truthfully insisted that he was not present for the murder, and that he became resigned as he had no choice but to go along with the statement the detectives sought.

80.    Jones also related his belief, apparently based upon what detectives told him, that he might receive as little as five or ten years in prison by falsely confessing to the murder. By the end, Jones even believed that Detective Ryan was on his side and "went to bat" for him against the other detectives, failing to convince them of Jones' innocence through no fault of his own, since Jones could not produce evidence while he was in custody to demonstrate that he was in New York when the murder occurred.

81.     In the months following his arrest, Jones wrote letters to Dukes proclaiming his innocence, asking Dukes why he lied and implicated Jones in the murder, and begging Dukes to set the record straight.  In the letters, Jones vacillates between anger at his longtime friend and forgiveness. Jones even explained to Dukes how his own false confession came about – detectives wore him down with threats and showing him Dukes' statement against him.  Jones had no reason to believe that anyone but Dukes would ever read these letters.  They were ultimately recovered by a search warrant executed on Dukes' jail cell.

82.     Jones' final written statement to police was the only evidence offered against him at trial for the murder of Erik Mitchell.  The other evidence presented by the prosecution related only to the October 1996 burglary, which the prosecution used to bootstrap the murder charge by, among other things, exploiting the false witness intimidation motive the detectives made up and coerced Jones into including in his false confession.

**Jones was in New York City When Erik Mitchell was Murdered in Albany**

83.     Jones was in fact in New York City when the murder of Erik Mitchell occurred.

84.     Sakina Mitchell testified as an alibi witness at Jones' trial but was not believed because of the misconduct of the Individual Detectives and the false evidence they created to implicate Jones in the Erik Mitchell murder.

85.     Other witnesses also supported Jones' alibi.  But they too were not believed because of the misconduct of the Individual Detectives and the false evidence they created to implicate Jones in the Erik Mitchell murder.

86.     Antoine Jones, Lavell's brother, testified that he and Lavell were together on the night of February 18, 1997 in an apartment they shared in Queens, New York and that he

remembered it because Lavell was with him between 9 p.m. and 11 p.m. when he was offered a job from Bloomberg on Park Avenue in Manhattan.

87.     Odessa Figueroa, a family friend, testified that she remembered seeing Jones between 4 p.m. and 5 p.m. on the day of the crime because he brought her a late Valentine's Day gift – a suit and a pair of shoes – which meant a great deal to her.

88.     And Shirley Jones, Lavell's grandmother, also recalled February 18 and the days surrounding it since she was ill at that time and forced to miss the annual fundraiser – always held on February 17 – for the fraternal order of women, of which she was a chairperson. She remembered that Jones came to her home the next evening, February 18th around 7:30 pm to check on her, and that she saw him every day until she was admitted to the hospital on February 20th and diagnosed with congestive heart failure.

### The Wrongful False Arrest and Prosecution of Pierre Lyons for the Erik Mitchell Murder

89.      Pierre Lyons cooperated with prosecutors, and on May 11, 1997 he testified as a witness before the grand jury as to the 1996 burglary.

90.     On November 10, 1997, after Jones' interrogation, Detectives Matos and Sbuttoni traveled to Georgia where Lyons was residing and obtained a false statement from him which indicated that he walked with Dukes and Jones to Mitchell's home on the night of the Erik Mitchell murder, unaware that Dukes was carrying a weapon, and continued walking away from the area as he heard a gunshot.

91.     Prior to Jones' trial in May 1999, Detectives arranged for and flew Lyons to New York, purportedly to testify against Jones for the 1996 burglary.  But in reality it was to obtain a more fulsome false confession from Lyons and to have him falsely implicate Jones and others for the Erik Mitchell murder.

92.     On May 19, 1999, when Detectives Matos and Sbuttoni were pretending to prepare Lyons as a witness against Jones, he allegedly made two statements indicating that he knowingly accompanied Dukes and Jones to Erik Mitchell's home for the purpose of resolving the dispute over the prior burglary, and acted as a lookout while Jones and Dukes confronted Mitchell; Lyons is claimed to have said that he saw Dukes with the gun as they fled.

93.     Based on Lyons' false statements implicating himself in the Erik Mitchell murder and Detective Matos and Sbuttoni's lies about his statements, Lyons was wrongfully prosecuted for this crime, and the false case against Jones for the Erik Mitchell murder was unfairly made to look stronger than it was.

94.     Lyons was tried for the Erik Mitchell murder and was ultimately acquitted after trial.

### The Individual Detectives Give the False Coerced Statements and Fabricated Evidence to Prosecutors and Deviated from Established Police Practices to Cause Jones' Wrongful Prosecution, Conviction, and Sentence

95.     The Individual Detectives did not document their misconduct.  They also lied in various police reports and in conversations with prosecutors about their misconduct and about the methods they used to coerce statements from Jones, co-defendants, and a witness.

96.     At least the following false, coerced statements, and fabricated evidence were created and transmitted by the Individual Detectives to prosecutors and relied upon to wrongfully prosecute Jones and obtain his wrongful conviction:

  a.  The April 19, 1997 statement by Parsons obtained by Detectives Matos and Sbottoni and recorded in a police report implicating Dukes in the Erik Mitchell homicide and falsely connecting the homicide to the earlier burglary;

b.  The September 8, 1997 statement Dukes precipitously signed through the manipulation of Detectives Matos and Wilcox which falsely implicated Dukes, Lyons, and Jones, and was crafted to match physical and forensic evidence known to the detectives and the Individual Detectives' theory of the case.

c.  On information and belief, Parsons was coerced by Detective Wilcox into signing the October 10, 1997 statement which falsely implicated Jones, and was crafted to match physical and forensic evidence known to the detectives and the Individual Detectives' theory of the case, as well as the prior statement of Dukes.

d.  The October 30, 1997 statement Sakina Mitchell was coerced by Detectives Ryan and McKenna into signing, which falsely implicated Jones, and was crafted to match physical and forensic evidence known to the detectives and the Individual Detectives' theory of the case, as well as the prior statements of Parsons and Dukes.

e.  The October 31, 1997 statement Jones was coerced into signing by Detectives Matos, Ryan, McKenna and Sbuttoni, which falsely implicated him, and was crafted to match physical and forensic evidence known to the detectives and the Individual Detectives' theory of the case, as well as the prior statements of Parson, Dukes, and Sakina Mitchell.

f.  Detective Ryan and/or Detective McKenna falsely stated and/or implied that everything in Sakina Mitchell's statement came from her alone, which was not only false but entirely impossible given that Sakina Mitchell had no

independent knowledge of the Erik Mitchell homicide or the Individual Detectives' theory of the case.

g.  Detective Ryan and/or Detective McKenna falsely stated and/or implied that he or they never threatened Sakina Mitchell or told her that Jones was going to get the death penalty if she did not cooperate.

h.  Detective Matos and/or Detectives Ryan, McKenna and Sbuttoni falsely stated and/or implied that Jones was never hit, threatened, or abused during the interrogation in Albany.

i.  Detective Ryan and/or Detective McKenna falsely stated and/or implied that Jones was realistically offered food in the 88th Precinct, but refused to eat it, and omitted that they abusively taunted him with pork they knew he would not eat.

j.  Detective Ryan and/or Detective McKenna falsely stated that Jones was offered food on the drive from Brooklyn to Albany but choose only to drink an iced-T.

k.  Detective Matos falsely wrote in a report and notes that Jones was given food when he was being interrogated in Albany and further falsely stated that Jones ate breakfast at approximately 4 a.m. on October 31, 1997.

l.  Detective Matos falsely wrote in a report that Jones was given an opportunity to sleep and further falsely stated that Jones fell asleep and got some rest before he signed the statement where he falsely admitted to participating in the Erik Mitchell homicide.

m. Detective Matos falsely wrote in a report that Jones offered to "tell the real truth" and hand wrote the statement where he falsely admitted to participating in the Erik Mitchell homicide.

n. Detective Sbuttoni and Detectives Matos, Ryan and/or McKenna falsely stated and/or implied that Jones was never sworn, threatened, or abused.

97. The Individual Detectives included physical evidence and forensic details about the crime, and their own theory of the case into the various statements they took from Dukes, Parsons, Sakina Mitchell, and Jones.

98. The conduct of the Individual Detectives was a gross violation of well-established police practices. It is improper for detectives to tell witnesses or suspects details about a case during questioning because it taints their statements and makes it impossible to determine what information came from the witnesses' or suspects' actual memory and what information came from the detectives. By including information that the persons being questioned did not know, the detectives not only perpetrated a fraud when claiming that the statements came from the persons being questioned, but it made it virtually impossible for defense counsel to convincingly argue and for prosecutors to determine that the statements were fake. This problem was exacerbated by the fact that the Individual Detectives affirmatively lied to the prosecutor to make it appear that the statements were voluntary when they were in fact coerced.

99. That the Individual Detectives manufactured the case against Jones using coercion and improper interrogation techniques, including contaminating the statements of the people they questioned and Jones, cannot reasonably be in dispute. Erik Mitchell was killed by Conrad, who acted alone, and did not know Parsons, Abdul-Hameed, Lyons, Dukes, or Jones. Yet Parsons, Dukes, Sakina Mitchell, and Jones all signed detailed statements falsely implicating Jones in the

Erik Mitchell murder which contained details detectives and the Individual Detectives knew and which conformed to the Individual Detectives theory of the case.

100.    Prosecutors used Jones' coerced and manufactured statement, the other coerced and manufactured statements, and the fabricated evidence to wrongfully prosecute Jones. The prosecutors successfully and unfairly exploited Jones' coerced confession before the grand jury, before the judge in the suppression hearing, before the jury in Jones' trial, and before the judge for sentencing because of the misconduct of the Individual Detectives.

101.    There was never any physical evidence connecting Jones to the Erik Mitchell homicide because Jones did not do it and was not present at the time of the murder.

102.    Jones was convicted of Burglary in the First Degree in violation of § 140.30(4), Burglary in the First Degree in violation of § 160.15(4), and Burglary in the Second Degree in violation of § 160.10 ("1996 burglary").  The 1997 murder was unfairly and unjustly tried together with the 1996 burglary because both crimes were totally unrelated and never should or would have been consolidated but for the misconduct of the Individual Detectives.  This improper consolidation caused by the misconduct of the Individual Detectives not only undermined confidence in the outcome of the trial, it erased any chance of Jones getting a fair trial.

103.    The unjust judgment of conviction was rendered after an unfair jury trial under indictment number 97-1306 in the Supreme Court of the State of New York, County of Albany, before Supreme Court Justice Thomas A. Breslin.

104.    On July 6, 1999, Jones was unjustly sentenced to 37 ½ years to life in prison.

105.    While serving his wrongful sentence, Jones moved to vacate his conviction based on newly discovered evidence, actual innocence, and because evidence adduced at his unfair trial

was procured by police misconduct in violation of due process, under C.P.L. §§ 440.10(1)(d), (g), and (h) and the New York State and United States Constitutions.

106.    On July 7, 2016, Judge Breslin granted the motion based on newly discovered evidence under C.P.L. § 440.10(1)(g), on consent of the prosecution, and the conviction was vacated as to all charges. The prosecution then moved under C.P.L. § 210.40 to dismiss the indictment as to the 1997 murder.  Judge Breslin granted the motion, effectively separating the 1997 murder charges from the 1996 burglary charges.

107.    In a subsequent proceeding, also on July 7, 2016, Jones pled guilty to Burglary in the First Degree in satisfaction of the 1996 burglary charges, and he was sentenced to an indeterminate term of 7 to 14 years in jail.  He was then released immediately, given that he had already served far more than what was allowable on the 1996 burglary charges and parole for these charges had already expired.

108.    The prosecution of the 1997 murder of Erik Mitchell was dismissed.  It was separate and distinct from the prosecution of the 1996 burglary, and Defendants knew or should have known they were separate.  Indeed, the two separate prosecutions were only connected as a result of the unlawful actions and misconduct of the Defendants.

109.    If the Defendants had not violated Jones' rights under the United States Constitution and under New York state law and falsely connected the October 1996 burglary to the Erik Mitchell homicide, Jones would not have been sentenced to 37 ½ years to life in jail (essentially a life sentence), he would have spent far less than the approximately 19 years he served in prison, and he likely would have been able to secure a plea to less than the 7 to 14 years in jail, which he accepted in order to be released from prison and end the terrible ordeal.

## DAMAGES

110.    As a direct and proximate cause of Defendants' actions, Jones was deprived of his civil rights under the Fourth, Fifth, Sixth, Eighth, and Fourteen Amendments of the United States Constitution and under the laws of New York.

111.    This action seeks damages from on or prior to October 30, 1997 through the present.

112.    The unlawful, intentional, willful, deliberately indifferent, reckless, negligent, wanton and/or bad-faith acts and omissions of Defendants caused Jones to be maliciously prosecuted, unfairly tried, wrongfully convicted, unfairly sentenced, deprived of liberty, and subjected to illegal searches and to cruel and unusual punishment during his incarceration.

113.    Such acts and omissions of Defendants caused the following injuries and damages to Jones which were foreseeable to Defendants at the time of the acts and omissions and which continue to date and will continue into the future: susceptibility to physical assaults and batteries and physical assault and batteries, physical injuries, pain and suffering, mental anguish, emotional distress, psychological damage, loss of liberty, loss of relationships, loss of family, loss of companionship, loss of consortium, loss of guidance, loss of emotional and psychological development, loss of maturing in a natural environment, loss of educational opportunity, loss of vocational training, loss of professional opportunity, loss of income, susceptibility to illness and illness, inadequate medical care, humiliation, embarrassment, degradation, and restrictions on diet, sleep, personal contact, athletics, personal growth and fulfillment, sexual activity, enjoyment and free expression.

114.    Such acts and omissions of Defendants entitle Jones to compensatory and punitive damages.

## FIRST CAUSE OF ACTION

**42 U.S.C. § 1983 Claims for Violations of the Right to a Fair Trial and Due Process of Law under the Sixth and Fourteenth Amendments of the U.S. Constitution (Against Individual Detectives)**

115.    Jones hereby incorporates and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein and further alleges that Individual Detectives acting individually and in concert and conspiracy, deliberately and recklessly, did the following.

116.    They improperly coerced Mathew Parsons, Carl Dukes, Pierre Lyons, and Sakina Mitchell to falsely implicate Jones in the murder of Erik Mitchell and leveraged this false evidence to obtain a false confession from Jones as to this murder.

117.    In particular, on April 19, 1997 Defendant Detectives Matos and Sbuttoni improperly coerced and manipulated Parsons to implicate Dukes in the murder of Erik Mitchell; on September 8, 1997 Defendant Detectives Matos and Wilcox coerced and manipulated Dukes into falsely confessing to the Erik Mitchell murder, and, in the process, falsely implicating Jones for participating in that murder; on October 10, 1997 Defendant Detective Wilcox improperly coerced and manipulated a false statement from Parsons implicating Jones in the Erik Mitchell murder; on October 30, 1997 Defendant Detectives Ryan and McKenna improperly coerced and manipulated a false statement from Sakina Mitchell implicating Jones in the Erik Mitchell murder; and on November 10, 1997 and May 19, 1999 Detectives Matos and Sbuttoni improperly coerced and manipulated false statements from Lyons implicating Jones in the Erik Mitchell murder.

118.    Also, on or before October 30, 1997 and on October 31, 1997, Defendant Detectives Matos, Ryan, McKenna and Sbuttoni improperly coerced and manipulated Jones into falsely confessing to participating in the murder of Erik Mitchell.  They took advantage of Jones'

youth, immaturity, emotional and psychological vulnerabilities and used physical violation, emotional abuse, threats (including threat of the death penalty), trickery, deceit, manipulation, and false promises, among other things, to persuade Jones to involuntarily and falsely confess to participating in the murder of Erik Mitchell.  Any waiver by Jones of the right not to answer questions posed by law enforcement was not freely or voluntarily given due to Defendants Matos, Ryan, McKenna and Sbuttoni improper actions.

119.    In addition, Defendants Detectives Matos, Ryan, McKenna and Sbuttoni fed Jones with facts he was unaware of but that were known by detectives of the Albany Police Department and Defendants Detectives Matos, Ryan, McKenna and Sbuttoni about Erik Mitchell's murder, and through contaminating Jones and/or using improper deception and manipulation they coerced him to incorporate those facts into a false confession.

120.    Moreover, Defendant Detectives Matos, Ryan, McKenna and Sbuttoni exploited the improperly coerced and manipulated statements of Parsons, Dukes, and Sakina Mitchell that they and Defendant Detective Wilcox obtained to improperly coerce Jones to falsely confess. They also used Lyons to make it seem, falsely, that another potential witness may have existed against Jones and to create the false impression that the case was stronger against Jones than it really was.

121.    Individual Detectives were police officers at the time of their actions, they knowingly forwarded false information to prosecutors and caused the prosecutors to conceal exculpatory evidence, including the coercive and deceptive techniques the Individual Detectives employed, and to use unreliable and false information to prosecute Jones.

122.    The information the Individual Detectives forwarded to the prosecutors and/or the concealment of the exculpatory evidence was likely to influence a jury's decision and/or undermine confidence in the outcome of the trial.

123.    Furthermore, Individual Detectives failed to timely disclose material favorable to the defense in contravention of *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny.

124.    No reasonable police officer in 1997 or thereafter would have believed that the actions of the Individual Detectives were lawful.

125.    As a direct and proximate cause of the actions of the Individual Detectives, Jones was wrongfully charged, prosecuted, convicted, and sentenced (deprived of liberty) in violation of his clearly established constitutional rights to a fair trial, and due process of law under the Sixth, and Fourteenth Amendments of the United States Constitution.

126.    Consequently, the Individual Defendants are liable to Jones under 42 U.S.C. § 1983 for compensatory and punitive damages.

## SECOND CAUSE OF ACTION

**42 U.S.C. § 1983 Claims for Violations of the Rights Against Self-Incrimination and to Due Process of Law under the Fifth and Fourteenth Amendments of the U.S. Constitution (Against Individual Detectives)**

127.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein, and further alleges as follows.

128.    The Individual Detectives, acting individually and in concert and conspiracy, used coercive interrogation techniques to break Jones' will causing him to sign a false confession and to becoming a witness against himself.

129.    These coercive interrogation techniques used by the Individual Detectives

include, among other things: (i) keeping Jones up for approximately 48 hours straight and denying him food for approximately 36 hours; (ii) physically assaulting him; (iii) verbally abusing him; (iv) lying to him about the evidence against him; (v) misrepresenting to him what the detectives could do to help Jones out of his predicament; (vi) threatening Jones with the death penalty; (vii) promising leniency for his cooperation, including making the gun charges go way and helping him avoid the death penalty; (viii) using fake evidence against him, including the coerced statements of Dukes and Sakina Mitchell; (ix) driving Jones many miles from his home in Brooklyn and separating him from his loved ones; and (x) encouraging Jones to minimize his role in the crime in his statement to trick him into falsely confessing.

130.    As a result of the Individual Defendants' deception, manipulation, and coercion Jones' will was overborne and his false confession was not a product of his free will and/or rational intellect, and Jones was deprived of his right not to be compelled to become a witness against himself.

131.    The deception, manipulation, and coercion that caused Jones' false and involuntary confession to participating in the Erik Mitchell murder was purposely concealed from prosecutors.

132.    Jones' false and involuntary confession to the Erik Mitchell murder was forwarded by the Individual Detectives to prosecutors and used against him by prosecutors to unfairly obtain an indictment, defeat pretrial motions, obtain a conviction, and secure a sentence of 37 ½ years to life in jail.

133.    No reasonable police officer in 1997 or thereafter would have believed that the actions of the Individual Detectives were lawful.

134.    As a direct and proximate cause of the actions of the Individual Detectives, Jones was compelled to become a witness against himself, and was wrongfully charged, prosecuted, convicted, and sentenced (deprived of liberty) in violation of his clearly established constitutional rights against self-incrimination and due process of law under the Fifth and Fourteenth Amendments of the United States Constitution.

135.    Consequently, the Individual Defendants are liable to Jones under 42 U.S.C. § 1983 for compensatory and punitive damages.

### THIRD CAUSE OF ACTION

**42 U.S.C. § 1983 Claim for Engaging in Conduct that Shocks the Conscience in Violation of Due Process under the Fourteenth Amendment of the U.S. Constitution (Against Individual Detectives)**

136.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein, and he further alleges as follows.

137.    In their effort to secure Jones' wrongful conviction, the Individual Detectives, acting individually and in concert and conspiracy, deliberately engaged in arbitrary, capricious, and conscious-shocking conduct that contravened fundamental canons of decency and fairness and violated Jones' substantive due process right under the Fourteenth Amendment of the United States Constitution.

138.    Specifically, the Individual Detectives deliberately exploited Jones' vulnerabilities, tricked, and threatened Jones to coerce his false confession, including, among other things, slapping him, ridiculing him, scaring him with the death penalty, depriving him of sleep for two days, depriving him of food for 36 hours then mocking him with food they knew he would not eat, and alienating him from support.  They fed him with facts that matched their theory of the case and fabricated a false confession that seemed compelling.  They fabricated

evidence from other sources (Parsons, Dukes, Lyons, and Sakina Mitchell) to make the case appear stronger against Jones and more difficult to overcome. They concealed their pre-indictment misconduct from prosecutors, making it impossible for the District Attorney's Office to evaluate and properly charged the case against Jones and to fairly prosecute him. They concealed from the defense, the court, and the jury their misconduct and exculpatory and impeachment evidence provided by witnesses, thus preventing Jones from fairly defending himself. And, they failed to correct their misdeeds and engaged in other conscience-shocking misconduct.

139.    The Individual Detectives advanced false and unreliable evidence to prosecutors causing Jones to be wrongfully indicted, prosecuted, convicted, and sent to prison.

140.    As a result of the Individual Detectives' deliberate, malicious, and cruel actions Jones suffered immensely, emotionally and physically.

141.    No reasonable police officer in 1997 or thereafter would have believed that the actions of the Individual Detectives were lawful.

142.    As a direct and proximate cause of the actions of the Individual Detectives, Jones' clearly established constitutional right to substantive due process of law was violated under the Fourteenth Amendment of the United States Constitution.

143.    Consequently, the Individual Defendants are liable to Jones under 42 U.S.C. § 1983 for compensatory and punitive damages.

## FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983 Claims for Malicious Prosecution and Deprivation of Liberty under the Fourth and Fourteenth Amendments of the U.S. Constitution (Against Individual Detectives)

144.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein, and he further alleges as follows.

145.    The Individual Detectives initiated, or caused the initiation of, criminal proceedings against Jones.

146.    The Individual Detectives knew that they lacked probable cause to initiate criminal proceedings against Jones as to the murder of Erik Mitchell and related charges.

147.    Prior to Jones' conviction on July 6, 1999 and continuing thereafter, the Individual Detectives, acting individually and in concert and conspiracy, covered up, lied to prosecutors about, and withheld from Jones the improper nature of their investigation, the falsity and unreliability of the evidence against him, including his false confession, and withheld exculpatory and impeachment material under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny.

148.    Disclosure of this information would have revealed to prosecutors that they were without probable cause to indict and pursue the criminal case against Jones for the murder of Erik Mitchell and related charges; and if the undisclosed misconduct and concealed fabricated evidence and exculpatory evidence were made known after indictment, the grand jury's probable cause determination as to the murder of Erik Mitchell would have been vitiated.

149.    The Individual Detectives knew they had duties under the United States Constitution as well as the laws and regulations of the State and the City of New York (a) not to falsify and fabricate evidence, (b) to disclose *Brady* and/or *Giglio* material to the Albany County

34

District Attorney's Office so that it could be disclosed to the defense and be used to prevent the conviction of Jones based upon false, misleading, or incomplete evidence and argument, (c) to make truthful statements to prosecutors about the actual nature of the evidence and the existence of *Brady* and/or *Giglio* material, and (d) not to cause or continue Jones' unconstitutional conviction and resultant injuries by lying about such evidence.

150.    Notwithstanding their awareness of their duties, the Individual Detectives, prior to, during, and following Jones' trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, falsified evidence, coerced statements from witnesses, coerced an involuntary and false confession from Jones, suppressed their misconduct, and concealed *Brady* and/or *Giglio* material from Jones, and lied about their wrongdoing.

151.    The Individual Detectives acted with actual malice, as demonstrated by, *inter alia*, their falsification of evidence, coercion of witnesses and Jones, suppression of their misconduct, and concealment of exculpatory and impeachment evidence.

152.    The prosecution terminated in Jones' favor when his conviction for the Erik Mitchell murder and related charges were vacated and dismissed on July 7, 2016.

153.    Upon information and belief, the Individual Detectives knew of one another's wrongful acts and displayed deliberate indifference to Jones' constitutional rights by failing to rectify one another's wrongful acts.

154.    No reasonable police officer in 1997 or thereafter would have believed that the actions of Individual Detectives were lawful.

155.    As a direct and proximate cause of the actions of the Individual Detectives, Jones was maliciously prosecuted in violation of clearly established constitutional rights not to be

unreasonably seized and deprived of liberty without probable cause under the Fourth and

Fourteenth Amendments of the United States Constitution.

156.    Consequently, the Individual Defendants are liable to Jones under 42 U.S.C. §

1983 for compensatory and punitive damages.

## FIFTH CAUSE OF ACTION

### Malicious Prosecution Claim Under New York State Law
### (Against All Defendants)

157.    Jones repeats and realleges each and every allegation contained in the preceding

paragraphs as if fully set forth herein, and further alleges as follows.

158.    The Individual Detectives caused the commencement and continuance of criminal

proceedings against Jones.

159.    There was no probable cause for criminal proceedings against Jones for the Erik

Mitchell homicide, and the Individual Detectives knew or should have known as much.

160.    The Individual Detectives acted with actual malice.

161.    The criminal proceedings against Jones terminated in his favor when his

conviction as to the Erik Mitchell homicide and related charges were vacated and dismissed on

July 7, 2016.

162.    Defendant the City of Albany is liable under the doctrine of *respondeat superior*

for the unlawful conduct of its employees, the Individual Detectives.

## SIXTH CAUSE OF ACTION

### Intentional, Reckless, and/or Negligent Infliction of Emotional Distress
### under New York State Law
### (Against All Defendants)

163.    Jones repeats and realleges each and every allegation contained in the preceding

paragraphs as if fully set forth herein, and further alleges as follows.

164.    The conduct of the Individual Detectives in deliberately causing, and/or recklessly, and/or negligently disregarding the risk of wrongful arrest, prosecution, and incarceration of Jones by, among other things (i) compelling him to be a witness against himself, (ii) fabricating evidence, (iii) withholding exculpatory material and impeachment evidence, (iv) threatening and coercing Jones and  witnesses, (v) lying to prosecutors, the court, the defense, and the jury, and (vi) causing Jones to be maliciously prosecuted for crimes he did not commit was extreme and outrageous and directly and proximately caused the grievous injuries and damages set forth herein.

165.    The Individual Detectives actions were in violation of clearly established law and no reasonable police officer in 1997 or thereafter would have believed the actions of the Individual Detectives to be reasonable or lawful.

166.    Defendant the City of Albany is liable under the doctrine of *respondeat superior* for the unlawful conduct of its employees, the Individual Detectives.

**WHEREFORE**, it is respectfully requested that this Court grant judgments in favor of Plaintiff Against the City of Albany, Detective Ronald Matos, Detective P.J. McKenna, Detective Anthony Ryan, Detective Michael Sbuttoni, and Phillippa P. Garland-Wilcox, Aministrator for the Estate of Detective Kenneth P. Wilcox, in the nature of:

(A)    Compensatory damages in an amount to be determined;

(B)    Punitive damages in an amount to be determined;

(C)    Pre-judgment interest as allowed by law;

(D)    An order awarding Plaintiff reasonable attorneys' fees, together with the costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

(E)    Such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        July 10, 2017

                                        **GLENN A. GARBER, P.C.**


                                        By: _____
                                              Glenn A. Garber

                                        The Woolworth Building
                                        233 Broadway Suite 2370
                                        New York, New York 10279
                                        (212) 965-9370
                                        *Attorney for Plaintiff Lavell Jones*